EUGENE RHODES AND PENNY-PLATE, INC. *v.*
LOUIS BERNARD

5-5263                            454 S. W. 2d 318

Opinion delivered June 1, 1970

*Clark, Clark & Clark* and *Wright, Lindsey & Jennings,* for appellants.

*Henry, Boyett & Morgan, Guy Jones, Sr., Phil Stratton* and *Guy Jones, Jr.,* for appellee.

JOHN A. FOGLEMAN, Justice. Appellee recovered judgment in a wrongful death action against appellants in the sum of $10,000 for the benefit of the estate of Rosemary J. Bernard, his late wife, and $125,000 for the benefit of her next of kin. Appellants argued that the trial court erroneously refused to direct a verdict for the defendants, that the verdict was such a shocking injustice that they were entitled to a. new trial and that the verdict was excessive.

The action arose from a motor vehicle collision which occurred on June 4, 1968, at a point about four miles east of Vilonia on U. S. Highway No. 64, where it ran east and west. Rosemary Bernard and Eugene Rhodes were the drivers and only occupants of the two vehicles involved. Mrs. Bernard was driving a 1965 model Dodge one-half ton (pickup) truck. Rhodes was operating a 1968 Ford tractor and trailer traveling from Searcy to Russellville in the scope and course of his employment by appellant Penny-Plate, Inc.

The collision took place at a point almost directly in line with a roadway proceeding north from the highway and another proceeding south. From this point the highway was straightaway to the east for approximately one-half mile. Although the approach to the

collision site from the east was on a slight downgrade, a driver approaching from that direction had a clear view of the scene for at least 1,400 feet. At the time of the collision Louis Bernard was driving a John Deere farm tractor pulling a planter which extended five feet to the rear of the rear tractor wheels. The planter and tool bar to which it was attached extended beyond the wheels on the tractor on each side. The main highway slab was asphalt pavement 22'3" wide. On each side of the highway slab there was an improved asphalt shoulder which appears to be at least as wide as a normal automobile and without any obstruction preventing its use by vehicles proceeding on or along the highway.

Appellants' argument that they were entitled to a directed verdict is based entirely upon their contention that the version of the occurrence related by appellee is contrary to the undisputed evidence and the physical facts. Even though we might think that the evidence preponderates against Louis Bernard's version of the incident, or even if we thought it highly improbable that the collision occurred in that manner, we cannot say that this evidence is not substantial unless it be demonstrated beyond controversy that, applying well-known laws of nature, mathematics, mechanics and physics, it was not physically possible that the collision and the incidents leading up to it occurred in the manner described by him. *Hot Springs Railway Company v. Hill*, 198 Ark. 319, 128 S. W. 2d 369. When we consider the evidence in the light most favorable to the appellee, drawing all reasonable inferences therefrom in his favor, we cannot say it has been demonstrated that it was impossible that the collision occurred in the manner appellee related.

Louis Bernard's version of the incident is as follows:

He and his late wife left their home on the morning in question with the objective of planting soybeans in a field south of the place the collision occurred. When they left home they separated and

she went by the post office. She overtook him at a point approximately one-fourth mile east of the point of the collision and followed him to the scene. The tractor Bernard was driving was equipped with a flashing light on its left rear at such a height that it would not be obscured by the following pickup truck. This light was in operation at all times on that day. From the time that she overtook him, neither his tractor nor the pickup truck was ever pulled entirely off the main-traveled portion of the highway. The left wheels of both were on the highway at all times, and the right wheels were off the highway on the shoulder. Bernard stopped the tractor at a point slightly east of the road to the south which he was about to enter, and his wife stopped the pickup truck immediately to the rear of the tractor and its equipment. Bernard waited until a vehicle approaching from the west passed him, looked to the east and, seeing no approaching vehicle and feeling that both vehicles could clear the highway, started across the highway at an angle in the direction of the roadway to the south. He shifted the tractor into second gear in which it could move at a speed of one to three miles per hour. He did this in order to "weave" the tractor on the road he was about to enter to avoid the planter's hitting shrubbery, trees and other growth. The first indication of danger that came to his attention was the sound of a horn and the squealing of brakes just as the back wheels of his tractor were leaving the main-traveled lanes of the highway. Bernard looked around and saw the truck strike the vehicle driven by Mrs. Bernard. He got just a glance at the tractor-trailer before the impact. At the time, the front of the Dodge pickup truck was not more than three feet to the rear of the planter on the tractor. His tractor wheels were at the edge of the pavement. He described the collision as having happened like a flash of lightning. Both vehicles skidded from the point of impact until they met an obstruction in the form of an embankment south of the highway. The sound of the

brakes continued until the vehicles came to rest. When they did, the Ford tractor was jammed into the left door of the pickup truck so that the door could not be opened. The impact was not broadside, but the pickup truck was hit on its left-hand side at an angle. The door was mangled in a way which would have been impossible if the pickup truck had been struck broadside.

The thrust of appellants' argument is that it was impossible for Mrs. Bernard to have made a left turn from the position described by her husband so that she could have been struck "broadside" as investigating state policeman Gwatney surmised and Rhodes and one Roy Wells testified. We cannot accept the premises upon which this argument is based as conclusive. In the first place, it is abundantly clear that the Bernard pickup was not struck broadside. Rather, the photographs and physical evidence confirm the fact that at the time it was struck the Dodge pickup truck was proceeding at more than a right angle to the path of appellants' vehicle. We are not favored with any evidence as to the length of the pickup truck or its turning radius. The skid marks made by the front wheels of this vehicle commenced at a point two feet south of the center line of the highway. The front end extended 2 to 2½ feet beyond its front wheels. Thus, at least four feet of the front of the Dodge pickup was south of the center line at the moment of impact. Examination of pictures of the Ford tractor clearly indicates contact with the top of the cab of the pickup truck at a point at least six feet from the left front corner of the Ford. Virtually all of the damage to the Ford tractor was at or near its right front corner. As indicated by the skid marks, the left front corner of the Ford tractor was very near the center line at the time of impact. Thus, it appears that the major impact to the pickup truck may have been at a point about 10 feet back of its front. Rhodes himself testified that the major damage to the pickup truck was at its left-hand door and left bed. A photograph shows considerable damage to this door, the left rear of the cab and left front end of the bed. It seems clear from

the evidence relating to the skid marks that all of the wheels of the pickup truck were on the main-traveled portion of the highway at the time it was struck. A picture shows its right rear wheel angling inwardly at the bottom. Even though the state policeman testified that he "imagined" that a portion of the back of the pickup truck was on the north shoulder of the road at this time there was no physical evidence to support this statement.

If indeed Bernard turned the tractor to his left from a dead stop, it could not have been traveling more than three miles an hour in second gear when he cleared the highway. He was followed by the pickup truck driven by his wife, who obviously must have started the truck from a dead stop after he commenced his turn. It could reasonably be inferred that the speed of her vehicle never exceeded three miles per hour. Rhodes estimated the distance from which he could see the point where the collision occurred as 900 feet. Appellant admitted that he was driving his truck in excess of the legal speed limit. At one time he admitted a speed of 50 to 55 miles per hour and stated that he increased his speed above 50 miles per hour knowingly. When asked how much he was speeding, his answer was "I don't know." Gwatney said that the whole pickup truck, on both sides, was bowed where the Ford struck it. Wells testified that at the time of the impact the Bernard tractor was across the highway on the south shoulder and stopped about 10 feet off the highway.

We do not know the normal rate of acceleration of the Dodge from a standstill to a speed of three miles per hour, but the jury might well have found that Rhodes' tractor-trailer, even at only 55 miles per hour, could have traveled more than 400 feet in the interval of time required for the pickup truck to reach its position in the highway from a position with the left wheels on the pavement but near its edge. This would be in addition to the distance Rhodes' vehicle could have traveled at that rate after the tractor turned but before the pickup truck did. The jury might have in-

ferred that Rhodes was driving his tractor-trailer unit at a much higher speed than he admitted. Not only did it appear from the skid marks on the pavement that he knocked the Dodge pickup truck 137 feet in a south-westerly direction after sliding at least 142 feet on a dry pavement with his brakes on 18 wheels locked,[1] but it could have been inferred that the vehicles stopped then only because of striking the embankment south of the south highway ditch. His vehicle weighed about 25,000 pounds and his load 18,000 pounds.

G. W. Coker, who stopped to assist Bernard in re-moving Mrs. Bernard from the pickup truck, Gwatney and Wells, all saw marks showing that the pickup truck struck this embankment against which it came to rest. Coker said the right front end was "kind of buried" in the bank. Wells supposed the bank stopped the ve-hicles. He said that these marks were still there at the time of trial.

It may well be that the jury also inferred that Rhodes was keeping no lookout and exercising some-what less than that degree of control which would per-mit him to stop if danger became apparent. Not only is there a conflict in his testimony and that of Wells as to the relative positions of the Bernard tractor and pick-up truck before either pulled onto the highway, but Rhodes never mentioned the John Deere tractor to the investigating officer. He testified at the trial that he hit his brakes and blew his horn when the tractor pulled onto the highway, but that, in disregard of the noise from the horn and "squeal" of the tires, Mrs. Bernard pulled the pickup truck onto the highway in front of his skidding truck. Yet when he explained the occur-rence to Gwatney, he said "When I saw her start across the road, I hit my brakes." Unquestionably, Rhodes was then referring to Mrs. Bernard in her pickup truck.

We are also unable to agree with the assertion of appellants that the pickup truck would have been dam-

---

[1]Roy Wells stated that when he first saw the Ford tractor he could hardly see its trailer because of the smoke from the tires grabbing.

aged at the rear or left rear had it been turning left from the westbound lane. This argument assumes that the pickup truck would have been traveling in a normal position with all wheels in the northbound traffic lane at the time it commenced its turn. This is not reasonably to be inferred from Bernard's testimony. The version of the incident most favorable to appellants would place the left wheels of the pickup at a distance of two feet off the highway as related by Rhodes. We see little difference in the possible angle of impact between a start with the left wheel two feet off the highway and one with those wheels on the highway near the north edge. Rhodes testified that the pickup truck made a sharp left turn when it started.

Appellants also argue that the only evidence worthy of credence is that of appellant Rhodes, Gwatney and Wells. Yet, we find factors from which a jury might have determined their testimony worthy of less than full credit. Except for measurements and observation of conditions after the collision, Gwatney got his version of what happened almost entirely from Rhodes, who certainly was not a disinterested person. Gwatney got little information from Wells other than the fact that the latter was in his yard somewhere close to the accident at the time it happened. The officer merely listed Wells as a witness. He testified that he "didn't get all that many statements." Gwatney's idea that the tractor hit the pickup truck broadside obviously must have come from Rhodes.

The fact that the collision was not broadside lends nothing to the weight of Rhodes' testimony. According to the version given by him on the witness stand, he first saw the John Deere tractor sitting on the shoulder but off the highway. He did not see the pickup truck until the tractor started across the highway, but said that he immediately started applying his brakes and blowing his horn on account of the movement of the tractor. He said that the pickup truck came onto the highway as he went past the tractor. Yet, he said that the pickup truck was close behind the tractor and that

the implement on the rear of the tractor was still in the south lane of the highway when he collided with the pickup truck. Rhodes admitted that on his discovery deposition prior to the trial he had at first placed Bernard's tractor in a position to his left of the pavement rather than on the right. He had also testified then that the tractor was stopped on the shoulder of the highway in a position to the rear of the pickup truck and that the truck only became visible to him when the tractor pulled out and headed across the highway.

Wells said that the collision occurred right in front of his house which was about 100 feet north of Highway No. 64. Appellants rely strongly on his testimony to show that both the Bernard tractor and the pickup truck were completely off the paved portion of Highway 64. Wells' testimony on this point is something less than positive. He first said that it "looked like" Bernard pulled his tractor completely off the highway, and it "looked like" the pickup truck stopped right behind the tractor off the north lane about five minutes later. Later, he was "pretty sure" the vehicles were stopped off the highway, but admitted that he made no real effort to see where Bernard stopped and that he didn't pay any special attention to the vehicles. Wells testified that he went back to work in his yard after the pickup truck arrived. He looked up after he heard first, the tractor go over the road, and then, a horn blowing. He said that Mrs. Bernard had then started the pickup truck up on the highway, but the truck driven by Rhodes was still not within his line of sight because of the obstruction to his view by a house to the east and closer to the highway than his. According to Wells when the horn started blowing, the pickup truck was on the north side of the road facing west. Wells' front lawn slopes away from the highway toward his house, so that the level of the highway was higher than his eye level. At the time he claims to have seen Mr. Bernard pull up and stop, Wells was about 75 feet from the highway.

There was no error in the court's submitting the

case to the jury on appellee's allegations of appellants' failure to keep a lookout, failure to exercise the requisite control and operation of the vehicle at an excessive speed.

Appellants rely upon the case of *Jamison v. Spivey,* 197 Ark. 698, 125 S. W. 2d 453, to support their second point for reversal. There the jury verdict for $6,500 was awarded in a case arising out of a relatively slight collision where the evidence of injuries was such as to cause this court to entertain grave doubts that it was sufficient to sustain a recovery of more than nominal damages. Certainly the collision here and the death of Mrs. Bernard could not cause such misgivings. Nor can we say, as did the court in *Singer Mfg. Co. v. Rogers,* 70 Ark. 385, 67 S. W. 75, 68 S. W. 153, (from which appellants' quotation in *Jamison v. Spivey* was actually taken), that the verdict is so clearly and palpably against the weight of the evidence as to shock the sense of justice of a reasonable person. What we have heretofore said has equal application to this point for reversal.

Appellants' arguments on their second point and those urged as to excessiveness of the verdict are somewhat overlapping, but we do not find the verdict so excessive in amount as to require a remittitur, as prayed by appellants.

Little need be said about the award to Mrs. Bernard's estate. Funeral expenses amounted to $600. Her husband found her pinned between the back of the Dodge seat and the steering wheel. Her feet were tangled in the brake and clutch pedals. Her right arm was bleeding. A piece of metal was imbedded in it. She was conscious and continuously saying "Lord help me," calling on her husband for help and whimpering and crying out during all the time efforts were being made by her husband, Coker and others to remove her. Her cries were only interrupted when she would lose her breath and slump over, after which she would raise up and resume them. Estimates of the time spent before she could be removed from the truck ranged from 35 to

60 minutes. Bernard said that when he first went to her, he could see evidence of pain in her eyes and that she held his hand so tightly that it hurt him. After she was removed from the pickup truck she was placed in an ambulance. She was still groaning and crying out and continued to do so, according to her husband, until she went limp, after the ambulance arrived in Conway, some 18 miles away, one hour after the collision. We cannot say that the amount awarded for pain and suffering was so excessive as to shock the conscience of the court, or lead to the conclusion that the verdict was the result of passion or prejudice or that the jury was not governed by the evidence.

Neither can we say that the recovery of $125,000 for the benefit of the next of kin was excessive. There was substantial evidence to show that this 38-year-old woman was an unusual wife and mother, and a dutiful housewife who performed all of the housekeeping and homemaking chores. She contributed her own earned income of $800 per year to the family living. Her contribution to the family livelihood was not limited to this income. She kept all of the books on her husband's farming operations, managed the finances, paid the bills and assisted in planning. She drove the truck while he was picking up hay and driving the tractor in feeding their cattle. She regularly attended to repairs, and obtained and hauled supplies, feed and fertilizer so her husband would not have to leave the field. She took hot meals to him when he was working in the fields. Her stepfather testified that Mr. Bernard had quit farming because he was unable to conduct his operations without her assistance. She not only did the washing, ironing and cooking for the family, but also kept a large garden. She canned 500 quarts of food for the family annually. She transported her three children wherever they needed to go.

There was also evidence from which the jury might have found that each member of this family suffered mental anguish and more than normal grief over the loss of a loved one. The family consisted of the parents

and three children. Edward, aged 20, her child by a previous marriage, was adopted by Louis Bernard. Mark, then 14, and Lou Ann, then 12, were the other two children. The family was described as being very close, and the home a very happy one. There was evidence tending to show that Mrs. Bernard was the central figure and force in that home. She seems to have been the counselor and confidante of all the others. She was shown to be the planner of family activities, which included birthday and holiday celebrations, picnics and fishing trips. It appears that she was a religious woman, who also led her family in this phase of their lives. The home was described as presently being a gloomy one, whose members were reluctant to stay at home.

Edward, a college student, was said to have failed in all his studies because of his inability to settle down or to concentrate after his mother's death. One witness said that this broke Edward's heart because he knew how much his mother wanted him to have a college education. One of Edward's friends testified that this son had missed his mother very much and had taken to frequent drinking.

Mark was said to have been so affected that he changed from a happy, mischievous "kidding" boy to a serious, quiet, sad and very unhappy one, who had been unable to find any substitute for his mother. It was said that on occasion he hangs his head and cries. He was also described as having a sad look in his eyes.

Lou Ann was said to be the closest of all to her mother. The two were described as inseparable. This young daughter had been open in her frequent displays of affection for her mother. Witnesses said that she had become a very unhappy little girl and that her grief was indescribable. Her father has heard her crying at night.

Friends and relatives testified that since his wife's death Louis Bernard seems a much quieter man, who

is unable to express himself or to keep going. He was said to have lost interest in everything and to have taken to heavy drinking. His mood, formerly described as good, was called sour. He said that shortly after his wife's death he commenced having stomach aches, passing blood and losing weight. His doctor prescribed ulcer medication. He had not regained the lost weight at the time of the trial.

When we consider that the verdict of $125,000 was to compensate all members of the family for earnings and other services Rosemary Bernard might reasonably have been expected to contribute to them in the years to come, the instruction, moral training and supervision reasonably to be anticipated had she lived, the husband's loss of consortium and the services of a wife so instrumental in assisting him in his labors and managing family and business affairs and for mental anguish above and beyond the usual grief over loss of their loved one, we cannot say that it was so excessive as to warrant a remittitur, even though we might feel that it is liberal.

The judgment is affirmed.