ST. LOUIS SOUTHWESTERN
RAILWAY COMPANY *v.* William M.
PENNINGTON, Administrator of the Estate
of Brenda TAYLOR, Deceased

76-155                                              553 S.W. 2d 436

Opinion delivered May 23, 1977
(In Banc)

*Coleman, Gantt, Ramsay & Cox,* for appellant.

*Gaughan, Barnes, Roberts, Harrell & Laney,* for appellee.

JOHN A. FOGLEMAN, Justice. This appeal was taken from a judgment for a total of $50,000 in a wrongful death action. It was rendered on a complaint by the personal representative of Brenda Taylor, who was killed in a railroad crossing collision between appellant's local freight train and a pickup truck occupied by Mrs. Taylor and her husband, Robert Lee Taylor. The collision occurred at approximately 8:45 p.m. on September 29, 1973, in Thornton at the intersection of Locust Street and appellant's railroad tracks. Both Mr. and Mrs. Taylor were killed instantly and separate wrongful death actions were instituted on behalf of their respective estates and next of kin.

When the Taylors were killed they were returning to their own residence after having attended a birthday party at the home of her sister, who lived two blocks from the fatal crossing. They were traveling westerly[1] on Locust Street

---

[1]The directions are stated to conform to the record and briefs. The bearing of Locust Street is N. 32⁰ 10⁰ W. It is perpendicular to the railroad

which crossed appellant's main line and spur siding tracks at a right angle. The tracks ran parallel, generally in a north-south direction. The center of the main line track was 14.8 feet west of the center of the spur siding track. The elevation of the main track was approximately one-half foot higher than the spur track.

Appellant asserts the following points for reversal:

## I

THE TRIAL COURT ERRED IN SUBMITTING AN INSTRUCTION REGARDING SPEED OF THE TRAIN TO THE JURY.

## II

THE TRIAL COURT ERRED IN SUBMITTING AMI 1802 (LOOKOUT) TO THE JURY.

## III

THE TRIAL COURT ERRED IN REFUSING TO GIVE APPELLANT'S OFFERED INSTRUCTION 14.

## IV

THE TRIAL COURT ERRED IN OVERRULING DEFENDANTS' MOTIONS FOR DIRECTED VERDICT.

## V

THE TRIAL COURT ABUSED ITS DISCRETION BY UNCONSOLIDATING THE CASES FOR TRIAL.

---

tracks. For some reason Locust Street which runs more nearly north and south than east and west, is treated as an east-west street and the railroad is treated as if it ran north and south.

## VI

THE VERDICT OF THE JURY WAS EXCESSIVE AND THE COURT ERRED IN SUBMITTING AN INSTRUCTION ALLOWING THE JURY TO FIND DAMAGES FOR MENTAL ANGUISH.

### I

Appellant objected to the giving of the following jury instruction:

> It is the duty of a railroad to operate its train at a speed no greater than is reasonable and prudent under all circumstances.
> A failure to meet this standard of conduct is negligence.

Appellant's argument that the giving of this instruction was error is two-pronged, i.e., there was no evidence on which to base a finding that there was negligence in operating the train at its speed of 40 to 45 miles per hour; the speed of the train could not have been the proximate cause of the injury. We find no error.

Basically, appellant's argument that there was no negligence in the speed of the train is that it is well known that the demands of modern transportation require high-speed operation which makes control difficult and that railroad crossings are, in themselves, danger signals; furthermore, the action of the engineer in lowering the speed of the train to 45 miles per hour was reasonable and prudent.

We recognize that it is a rare case when the speed of a train is an issue for the jury in a crossing collision case. See, Comment, AMI 1803, AMI, Civil, 2d Ed. But there are such cases, usually when the crossing is in a town, and there are obstructions to a motorist's or pedestrian's view of the tracks in the direction of the train's approach, or of the train crew's view of those approaching the crossing. See *Davis v. Scott,* 151 Ark. 34, 235 S.W. 407; *Zaloudek v. Missouri Pac. R. Co.,* 193

Ark. 344, 99 S.W. 2d 567.

This is one of those rare cases. The collision occurred in Thornton, population about 750. There are two streets crossing appellant's double-track line through Thornton. At the time of the collision the train, consisting of only the engine and a caboose, was proceeding south returning to Camden from Fordyce after having completed switching operations along the line between Camden and Fordyce. It was being operated by fireman Hagan, who was then in a training program to qualify as an engineer. Engineer Hall and brakeman Sparks were also in the cab of the engine, which was actually moving backward. The train had travelled the six miles from Fordyce to the scene of the collision in ten minutes. The spur track commenced about one-half mile north of Locust Street. A train of 122 empty cars, with engine and caboose, had been spotted on the spur track in Thornton a short time before the arrival of the remnant of this local freight train, but the crew was aware of its presence through radio communication. The train on the spur track was split into three parts in order to clear the crossings. The car spotted nearest the crossing was a flatcar located 93 feet 10 inches south of Locust Street. The first car north of the crossing was a boxcar 119 feet away. There were nine boxcars, each 54 feet 4 inches long and 15 feet 3 inches high between Locust and Highway 167. Part of the cars of this train were north of Highway 167. As the train approached the Locust street crossing, it first crossed Highway 167 only one block, but 719 feet, from Locust. Fireman Hagan had reduced the speed of the train to 45 miles per hour (or 66 feet per second) as he approached Thornton, because of the presence of the train parked on the spur track. Hagan, who was in the engineer's seat, was unable to see the approaching Taylor truck until the engine was approximately 146 feet from the Locust Street crossing. It would have been impossible for him to have stopped the train in that distance. The fireman applied the emergency brakes when he first saw the Taylor truck moving very slowly on the passing track. He was then approximately 120 feet north of the Locust Street crossing, but the train did not come to a stop until it was at least 750 feet north of the crossing.

The daily traffic average at the Highway 167 crossing was between 1,100 and 1,200 vehicles per day and at the Locust Street crossing, it was 150 to 200. An average of 22 trains per day pass through Thornton on appellant's tracks. The highway crossing is protected by an automatic gate which blocks the crossing when a train is passing through it and by flashing electric signal lights and bells. The Locust Street crossing is unprotected except for the conventional railroad crossing signs and stop signs. As a result of the spotting of the empty freight cars, the protective devices on Highway 167 had been in operation for over an hour before the collision and appellant's dispatcher had been advised of this condition and a signal maintainer had been sent to clear that crossing. He cleared the crossing just seconds prior to the collision. So for at least an hour the Locust Street crossing was the only crossing open in Thornton.

The testimony was conflicting as to a vehicle driver's visibility of the main track to the north. There was evidence that his view was obstructed until the front wheels of the vehicle were on the main track. Other evidence indicated that he could have seen a train to the north on the main track as soon as his vehicle had passed over the spur track. There was testimony indicating that the rear of the engine, which was moving backwards, collided with the right front of the pickup truck. Obstruction of the train crew's view of persons approaching a railroad crossing in the town or city and of the view of the approaching train by those approaching the crossing by the spotting of cars on a sidetrack was a factor to be considered along with the speed of the train in determining whether there was negligence in the operation of the train. *Zaloudek* v. *Missouri Pac. R. Co.,* supra, 193 Ark. 344.

The moment the signal maintainer cleared the highway crossing, he saw this engine and caboose approaching from the north and gave it a "highball" or "go ahead" signal right after it passed him. It is not clear whether this witness saw the headlights of the automobile approaching the Locust Street crossing from the east at the time he gave the signal or immediately thereafter. The headlights of the car were visible to him under the passing train and under the railroad cars spotted on the spur track. The "highball" signal meant that

there was no danger to the passing train from the dead freight on the spur and that the train could proceed at its normal, regular speed.

The speed regulator or speedometer on the engine was broken. The speeds were estimated by the train crew, although the fireman said he had checked the speed by his watch and the mile posts. The fireman's reason for decreasing the speed was to allow him to blow the horn longer in approaching the crossings. A witness who lived near the crossing saw the collision. He could see the headlights of the Taylor pickup truck and could tell that it stopped at the intersection of Locust and South First Streets at a point about 200 feet east of the main track. He said that he could hear the train approaching the highway crossing at that time. The pickup truck, according to him, proceeded toward the crossing at approximately 20 miles per hour but slowed down about one-half way to the spur track, and virtually stopped at that track and then barely moved across this track onto the main track. He saw the brake lights of the truck just as it reached the main track and then it was struck by the train almost immediately. He said that the train was only 50 feet from the crossing when its brakes were applied. The Taylor truck was pushed or "swept" into the end of the flatcar south of the crossing. Mr. Taylor's body was pinned under the truck which came to rest between the spur track and the main line, but pinned against the flat car. Mrs. Taylor's body was found some 20 feet further south.

While we have viewed the evidence in the light most favorable to appellee, as we must in determining whether there was an issue of fact, the circumstances existing at the time were sufficient to pose a question whether the speed of the train's movement through Thornton was negligence. The fact that the railroad had established its own speed limit of 65 miles per hour through Thornton does not mean that reduction of the speed below that figure is, as a matter of law, the reasonable and prudent action of a reasonably careful person. The train crew recognized that a hazardous condition existed in Thornton or the speed of the train would not have been reduced. Cf. *St. Louis Southwestern Ry. Co. v. Jackson*, 242 Ark. 858, 416 S.W. 2d 273. The extent to which it should have

been reduced, in the exercise of due care, was a question of fact. Appellant also seems to be convinced that no conclusion that the train was moving faster than 45 miles per hour could be reached. The jury may well have felt that the train was proceeding faster than the estimate of 45 miles per hour by the engineer, who judged only by the "feel" of the movement or that arrived at by an engineer-trainee by watch checking and pole counting. There is no evidence relating the estimated speed to the time required for the brakes to become operable or to stop the engine and caboose after the emergency brakes were applied. The absence of such testimony is significant. Cf. *Missouri Pac. R. Co.* v. *Nelson,* 195 Ark. 883, 115 S.W. 2d 872; *Harper* v. *Missouri Pac. R. Co.,* 229 Ark. 348, 314 S.W. 2d 696. From the force of the impact and the distance traveled by the "bobtailed" train, the jury might have inferred that the speed was much faster. The engineer had reported the accident by radio before the train was brought to a stop. The jury might also have drawn the inference that the "highball" caused the trainee engineer to take steps to increase his speed as he moved toward the Locust Street crossing. The question whether the speed of the train was excessive was properly submitted to the jury. *St. Louis Southwestern Ry. Co.* v. *Jackson,* supra.

The question of proximate cause, given negligence, is more often than not a question of fact, to be determined by viewing the attendant circumstances. *Booth & Flynn* v. *Price,* 183 Ark. 975, 39 S.W. 2d 717, 76 ALR 957; 57 Am. Jur. 2d 487, Negligence § 136. It has been said that proximate cause is a rule of physics and not a criterion of negligence. *Collier* v. *Citizens Coach Co.,* 231 Ark. 489, 330 S.W. 2d 74. Proximate cause may be shown by circumstantial evidence. *Arkansas Lumber Co.* v. *Luckett,* 201 Ark. 140, 143 S.W. 2d 1107. Such evidence is sufficient if the facts proved are of such a nature, and are so connected and related to each other, that the conclusion therefrom may be fairly inferred. *Biddle* v. *Jacobs,* 116 Ark. 82, 172 S.W. 258. In order to pose a jury question on the causal connection between negligence and an injury, it is not necessary that the evidence exclude every other reasonable hypothesis. *Hill* v. *Maxwell,* 247 Ark. 811, 448 S.W. 2d 9. It is only necessary that there be evidence that would tend to eliminate such other causes as may fairly arise from the

evidence, and that the jury not be left to speculation and conjecture in deciding between two equally probable possibilities. *Hill v. Maxwell*, supra; *Standard Pipe Line Co. v. Burnett*, 188 Ark. 491, 66 S.W. 2d 637; *Turner v. Hot Springs St. Rwy. Co.*, 189 Ark. 894, 75 S.W. 2d 675. But it is not necessary, in order to have sufficient evidence to support a finding of proximate cause, that circumstantial evidence exclude a concurring efficient proximate cause, as distinguished from a totally independent and unrelated cause. *Southern Grocery Stores Inc. v. Greer*, 68 Ga. App. 583, 23 S.E. 2d 484 (1942); *Missouri Pac. R. Co. v. Frye*, 214 Ark. 92, 214 S.W. 2d 495; *Gatlin v. Cooper Tire & Rubber Co.*, 252 Ark. 839, 481 S.W. 2d 338; *Oviatt v. Garretson*, 205 Ark. 792, 171 S.W. 2d 287; *Bennett v. Bell*, 176 Ark. 690, 3 S.W. 2d 996. In cases of comparative negligence, the negligence of the plaintiff and that of the defendant are concurring causes. See *Hubbard v. Graves*, 240 Ark. 64, 398 S.W. 2d 69.

The pickup truck was barely moving when struck. There was evidence from which it might appear that even greater signaling time than the ten seconds the train crew felt it had gained by its reduction of speed would have made a difference in the truck driver's ability, if the train had been moving even slower, to have applied his brakes in time to stop. There was testimony that the pickup truck would have stopped completely if the driver had merely lifted his foot from the accelerator. Significantly, the train crew testified that it would not have been possible at the train's speed to have given a normal crossing signal between the two crossings. The evidence on proximate cause was sufficient to justify the submission of the speed issue. See *Ford v. St. Louis I.M. & S. Ry. Co.*, 66 Ark. 363, 50 S.W. 864.

## II

The trial court gave AMI 1802, based on Ark. Stat. Ann. § 73-1002 (Supp. 1975). Appellant contends that the evidence that the crew was keeping a lookout is undisputed, that those in the cab saw the truck and at their first opportunity took immediate action. But we will not consider this question because no objection was made to it. *Willis v. Elledge*, 242 Ark. 305, 413 S.W. 2d 636; *Evins v. St. Louis &*

*S.F. Rd. Co.,* 104 Ark. 79, 147 S.W. 452.

Appellant argues that no separate, specific objection to this instruction was necessary, because it moved for a directed verdict and argued that there was no evidence that a proper lookout was not maintained. This was done at the conclusion of the evidence on behalf of appellee-plaintiff, but the court then refused to rule on separate issues of negligence, simply holding that the evidence was sufficient to present a question for the jury. At the conclusion of all the evidence, appellant renewed all motions previously made in a general, formal manner, without mentioning the lookout issue specifically. The trial judge would not consider the motion for directed verdict issue by issue and said that such matters should be handled in connection with jury instructions. When he stated which requested instructions would be given and which refused, he specifically stated that the issues raised by plaintiff's allegations of negligence as to lookout would be submitted. When he invited the parties to make objections to his rulings, appellant made objections to certain of these instructions, but did not make any objection to the lookout instruction. The potential for waste of judicial resources, both at the trial and appellate levels, is too great for us to relax the rule that the failure to make a specific objection to the giving of an instruction constitutes a waiver under circumstances such as this.

## III

Appellant's requested instruction No. 14 was a modified form of AMI 1804. AMI 1804 reads as follows:

> A railroad grade crossing is a place of danger. It is the duty of the driver of a motor vehicle approaching a crossing to use ordinary care to look and listen for trains, which may require stopping his vehicle if necessary to have an effective view of the tracks in both directions.

Appellant's modification would have substituted the words "persons in an automobile" for the words "the driver of a motor vehicle" and would have eliminated the closing phrase

"in both directions." The court refused this modification but gave AMI 1804, which was appellant's requested instruction 14A. Appellant argues that a passenger in a motor vehicle is under the same duty as the driver to "stop, look and listen."

We find no error. We simply are unable to grasp appellant's argument that this instruction was mandated because the evidence was hopelessly conflicting as to the identity of the driver. Of course, appellant's requested instruction would have eliminated the issue as to the identity of the driver, but appellant does not explain and we do not understand why this factual dispute made a passenger's duty any different from what it would have been had the identity of the driver been established beyond doubt. It is clear that a passenger does not, and cannot, have the same control as the driver has over the operation of an automobile. Cf. *Missouri Pac. R. Co.* v. *Henderson,* 194 Ark. 884, 110 S.W. 2d 516. A passenger can look and listen, but he would be hard put to stop the vehicle. The court did give AMI 910 which fully covers the duty of a passenger to exercise ordinary care for his own safety under the circumstances. *St. Louis-S.F. Ry. Co.* v. *Steele,* 185 Ark. 196, 46 S.W. 2d 628; *Missouri Pac. R. Co.* v. *Henderson,* supra.

Appellant relies upon language in *St. Louis S.F. Rd. Co.* v. *Perryman,* 213 Ark. 550, 211 S.W. 2d 647; *Chipman* v. *Missouri Pac. R. Co.,* 195 Ark. 721, 114 S.W. 2d 14; and *Crossett Lumber Co.* v. *Cater,* 201 Ark. 432, 144 S.W. 2d 1074 to justify the instruction requested by it. In *Perryman,* we said that occupants of a car, other than the driver had the duty to comply with the "stop, look and listen" rule. This dictum was supported by citation of *St. Louis-S.F. Ry. Co.* v. *Steele,* 185 Ark. 196, 46 S.W. 2d 628. But in that case, we had simply held that a guest of an automobile driver was bound to exercise ordinary care for his own safety under the circumstances. In both *Cater* and *Chipman,* the passenger was found to be guilty of contributory negligence. In *Cater,* the passenger did see the headlight of the train when the car in which she was riding was at least 100 feet from the crossing, but was held to have been negligent in not ascertaining that the driver was cognizant of the peril. In *Chipman,* the court was split on the question of propriety of a directed verdict for the railroad in a suit by an automobile

passenger. In that case the passenger simply did not see what was plainly to be seen. The automobile in which he was riding struck the side of the second car of a freight train being pushed across the crossing. The plaintiff passenger, although looking ahead and watching the road did not even see the train until the automobile was within ten feet of the freight car struck. We could not base the rule of law appellant urges upon these authorities. The instruction requested was not a correct instruction, and the instruction given adequately covered the issues.

## IV

To hold that there was error in the trial court's failure to direct a verdict would not be consistent with our position on the issue of speed. We certainly cannot agree that appellee's taking a non-suit as to engineer Hall when appellant moved for a directed verdict as to all of the defendants was virtually tantamount to a concession that there was no issue of fact. The difference in the position of Hall and that of Hagan and of appellant itself is so obvious that further discussion of this argument is inappropriate.

Otherwise appellant argues that both Mrs. Taylor and her husband were, as a matter of law, guilty of negligence that was at least as great as that of appellant. It relied for the most part on cases in which contributory negligence on the part of a plaintiff had been found to exist as a matter of law, during the time when contributory negligence was an absolute bar to recovery. This reliance is, of course, misplaced.

The weighing of relative fault is peculiarly a jury function. *Baker v. Matthews,* 241 Ark. 539, 408 S.W. 2d 889; *Willingham v. Southern Rendering Co.,* 239 Ark. 858, 394 S.W. 2d 726; *Missouri Pac. R. Co. v. Yandell,* 209 Ark. 569, 191 S.W. 2d 592. It is only in rare instances that this court should disturb a jury verdict on the issue of comparative negligence, if there is evidence of negligence by both parties. *National Credit Corp. v. Ritchey,* 252 Ark. 106, 477 S.W. 2d 488; *Hicks v. Hall,* 253 Ark. 103, 484 S.W. 2d 696; *Willingham v. Southern Rendering Co.,* supra. In order to overturn a jury verdict on the question, we should have to say that the plaintiff's (or plaintiff's

decedent's) negligence was equal to or greater than that of the defendant's as a matter of law, which actually means that reasonable minds could not differ about the matter. *National Credit Corp.* v. *Ritchey,* supra; *Missouri Pac. R. Co.* v. *King,* 200 Ark. 1066, 143 S.W. 2d 55; *Missouri Pac. R. Co.* v. *Price,* 199 Ark. 346, 133 S.W. 2d 645; *St. Louis-S.F. Ry. Co.* v. *Horn,* 168 Ark. 191, 269 S.W. 576. See also, *Hicks* v. *Hall,* supra; *Willingham* v. *Southern Rendering Co.,* supra. It is not the province of this court to compare the negligence of the parties when fair-minded men might reach different conclusions. *McDonald* v. *Hickman,* 252 Ark. 300, 478 S.W. 2d 753. If there is any substantial evidence to support the jury's finding that the negligence of the defendant was greater than that of appellee's decedent we must affirm the judgment. See *Hopper* v. *Hunter,* 256 Ark. 650, 509 S.W. 2d 548; *Smith* v. *Aaron,* 256 Ark. 414, 508 S.W. 2d 320; *Bryant* v. *McAlister,* 247 Ark. 859, 448 S.W. 2d 13; *Easley* v. *Inglis,* 233 Ark. 589, 346 S.W. 2d 206; *Missouri Pac. R. Co.* v. *Yandell,* supra; *Missouri Pac. R. Co.* v. *Price,* supra.

We cannot say that there was no substantial evidence to show that appellant's negligence was greater than that of Brenda Taylor.

If the jury found that Mrs. Taylor was the passenger, rather than the driver, a distinct possibility, we would certainly be hard put to say that her ability to see the approaching train in time to cause the pickup truck to be stopped in time to avoid the catastrophic collision was so clearly shown or that her negligence in failing to see the train or warn the driver was, as a matter of law, equal to or greater than the negligence of appellant.

## V

Separate actions were brought against appellant by the respective personal representatives of the estates of Mr. and Mrs. Taylor. On motion of appellee these actions were consolidated, without any objection on the part of appellant or the administrator of Mr. Taylor's estate. The cases were then set for trial on February 2, 1976. A pretrial conference was held in both cases on January 27, 1976. A settlement between

appellant and the administrator of Robert Lee Taylor, insofar as his next of kin were concerned, was made on January 29, but claims for property damage and funeral expenses (on which State Farm Mutual Automobile Insurance Company had intervened as subrogee) were not settled.

When the consolidated cases were called for trial, no one appeared for the Robert Lee Taylor estate. Appellant moved for a joint trial or a continuance of both cases, so they could be tried jointly at a later date. Appellant had recognized the existence of the subrogation rights of the insurance company. The only prejudice specified by appellant was the great expense of having witnesses present for two different trials. The trial judge announced that he was "unconsolidating" the cases and would try the case as to Brenda Taylor but continue the case as to the Robert Lee Taylor estate.

The attorney for the insurance company was not the attorney representing the latter estate and he had been excused by the trial judge from attending the trial, on the representation that the subrogation rights of his client were being protected by appellant. The judge stated that he had been advised of the settlement on Friday, January 30, and had talked with the insurance company's attorney, who stated that he could not be ready for trial on Monday. He recalled that, at the pretrial conference, the attorney for the Robert Lee Taylor estate had indicated that he would present the claims for property damage and funeral expense.

The consolidation of the two separate and independent causes of action was proper under the provisions of Ark. Stat. Ann. § 27-1305 (Repl. 1962). *Murray* v. *Jackson,* 180 Ark. 1144, 24 S.W. 2d 960. The purpose of this act was conservation of judicial resources and expense to litigants by saving a repetition of evidence and an unnecessary consumption of time and costs in actions depending upon substantially the same evidence or arising out of the same transactions. *St. Louis, I.M. & S. Ry. Co.* v. *Raines,* 90 Ark. 482, 119 S.W. 266. By this consolidation the two causes of action were not so firmly welded together that they must of necessity have been tried simultaneously as one case. Each plaintiff would have had to make out his own case. *Moore* v. *Rogers Wholesale*

*Grocery Co.,* 177 Ark. 993, 8 S.W. 2d 457. They remained separate and distinct causes of action. *State Life Ins. Co. v. Goodrum,* 189 Ark. 509, 74 S.W. 2d 230; *New York Life Ins. Co. v. Farrell,* 187 Ark. 984, 63 S.W. 2d 520; *Murray v. Jackson,* supra. The jury might have returned inconsistent verdicts had the cases gone to trial, since the verdict in one case would not have been binding on the jury in the other. *Leech v. Missouri Pac. R. Co.,* 189 Ark. 161, 71 S.W. 2d 467; *Rudolph v. Mundy,* 226 Ark. 95, 288 S.W. 2d 602; *Brown v. Parker,* 217 Ark. 700, 233 S.W. 2d 64; *Green v. West Memphis Lumber Co.,* 192 Ark. 1177, 91 S.W. 2d 261. Evidence admissible in one case might not have been admissible in the other. *Murray v. Jackson,* supra.

We have heretofore recognized that where several plaintiffs jointly proceeded against one defendant in a single suit on separate causes of action that could properly have been consolidated if brought separately, the trial court, in the exercise of its discretion, might order a severance if one of the parties would be prejudiced by proceeding with the joint action. *Holcomb v. American Surety Co.,* 184 Ark. 449, 42 S.W. 2d 765. The fact that these causes of action were consolidated instead of having been brought jointly is immaterial and, even though in *Holcomb,* we hypothecated a situation where a defendant might be prejudiced, the trial court should have the same discretion where the rights of one of the plaintiffs might be impaired.

Although the purposes of the consolidation statute are salutary, they do not override all other considerations. The act did not mandate consolidation of these causes of action, as it simply permitted the court to "make such orders and rules concerning the proceedings therein as may be conformable to the usages of courts for avoiding unnecessary costs or delay in the administration of justice" and to "consolidate said causes when it appears reasonable to do so." This calls for the exercise of sound judicial discretion. When circumstances change after the discretion to consolidate has been exercised, so that the reasons for consolidation no longer exist, or the consolidation operates to produce unnecessary delay in the administration of justice, then it may no longer appear reasonable to preserve the consolidation. It is only

logical that the court then be permitted to exercise its sound judicial discretion to separate the cases for trial by setting aside the order of consolidation in the interest of justice. *State v. Randall*, 386 S.W. 2d 67 (Mo., 1964). The exercise of this discretion should not be reversed on appeal unless the party appealing has suffered some injury. *Young v. Gray*, 65 Tex. 99 (1885). Where the result reached in the case first tried will have the same and no other effect than if the cases were tried together, such injury is improbable. *Young v. Gray*, supra.

We certainly cannot say that the granting of a continuance in the case of the estate of Robert Lee Taylor was an abuse of discretion. But continuing this case when both parties were ready for trial and all witnesses were present, could well have been an injustice to appellee and would be insofar as he is concerned, a delay in the administration of justice. Since appellant's attorney and all its witnesses were present when the continuance was granted, it had already incurred some part of the duplication of expense to be avoided by consolidation and continuing both cases would not have relieved it of this duplication. To say the least, we cannot say that there was an abuse of discretion in this respect.

## VI

This is the point that has given us the most concern. The jury verdict included awards of $2,600 each to William M. Pennington, Chris Castleberry, Lanell Williams, Marcey Ernest and Patsy Pierce, adult siblings of Brenda Taylor. It awarded $35,000 to Florence Pennington, her mother, for loss of contributions and mental anguish. Since the prayer for relief sought only $15,000 for loss of contributions,[2] the $20,000 remainder of the verdict can only be sustained as an award for mental anguish, and it does seem extremely liberal.

The review of judgments for mental anguish in wrongful death cases has been like an anathema to this court ever since

[2]See, *Thudium v. Dickson*, 218 Ark. 1, 235 S.W. 2d 53; *Turner v. Smith*, 217 Ark. 441, 231 S.W. 2d 110; *The Western Union Tel. Co. v. Byrd*, 197 Ark. 152, 122 S.W. 2d 569; *Cohn v. Hoffman*, 45 Ark. 376; *Pleasants v. Bank of the State*, 8 Ark. 456; *Hudspeth & Sutton v. Gray, Durrive & Co.*, 5 Ark. 157. Furthermore, it is doubtful that the evidence would have supported a larger award for this element of damages.

it was made an element of damages recoverable by Ark. Stat. Ann. § 27-906 et seq (Repl. 1962) and its predecessors, Acts 39 and 115 of 1949. This element has been described consistently with our decisions in AMI, Civil, 2d Ed. 2215 and 2216, viz:

> Second, let me explain to you what is meant by mental anguish. This term means the mental suffering resulting from emotions such as grief and despair. It must be real and with cause and be more than the normal grief occasioned by the loss of a loved one.

In *Peugh v. Oliger,* 233 Ark. 281, 345 S.W. 2d 610, we first wrestled with the problem in full recognition of the fact that the legislative enactment changed the Arkansas law which had theretofore barred such recoveries because mental suffering unaccompanied by physical injury was too remote, uncertain and difficult of ascertainment. The statute removed the bar, but did not make this element of damages any more certain or less difficult of ascertainment. The Arkansas Law Review writer of the comments on Acts 39 and 115 of 1949, was indeed a prophet when he concluded with this remark:

> *** It may be expected that the Supreme Court will be faced with numerous appeals asserting that the jury allowed excessive damages and that it will be some time before a definite pattern is set.

The pattern has not yet been set, and it often seems that we are no closer than we were when this gloomy forecast was made.

The reasons for the difficulties presenting themselves are at once apparent. The allowance of this element of damages is an attempt to compensate an emotional injury with money damages, or as it has been put, to allay grief by the payment of money. *Florida Dairies Co. v. Rogers,* 119 Fla. 451, 161 So. 85 (1935). Even though the provision for recovery for mental anguish under our wrongful death statute makes it different from the statutes of a vast majority of the states, and in spite of the argument that these damages are more punitive than compensatory, we have no quarrel with the policy decision of

the General Assembly on this score, fully recognizing that there were good arguments supporting the attempt to provide for compensation for grief. But it cannot be gainsaid that such a recovery is a solatium (*Interurban Railway Co.* v. *Trainer,* 150 Ark. 19, 233 S.W. 816), i.e., "sentiment, love, or affection, as distinguished from a property loss"; "compensation as a soothing to the affections or wounded feelings, and for loss of the comfort and social pleasure there is in the association between members of a family." Annot. 74 ALR 11, 23 et seq (1931); *Marshall* v. *Consolidated Jack Mines Co.,* 119 Mo. App. 270, 95 S.W. 972 (1906). But there is no yardstick by which this kind of compensation can be measured. *Georgia Southern & Florida Ry. Co.* v. *Perry,* 326 F. 2d 921 (5 Cir., 1964). Mental anguish cannot be measured in terms of money. See *Knierim* v. *Izzo,* 22 Ill. 2d 73, 174 N.E. 2d 157 (1961). See also, *J. Paul Smith Co.* v. *Tipton,* 237 Ark. 486, 374 S.W. 2d 176. Mental anguish will vary in every case with the nervous temperament of the individual, his ability to withstand shock, sex, circumstances, positions in life, and in innumerable other respects. *Merrill* v. *Los Angeles Gas & Electric Co.,* 158 Cal. 499, 111 Pac. 534, 139 Am. St. Rep. 134, 39 LRA (n.s.) 559 (1910). We react differently when shadowed by death because of differences in nervous strain, environment, social background and appreciation for degrees in character, etc. See *Florida Dairies Co.* v. *Rogers,* supra.

The problem is neither new nor peculiar to Arkansas. We have long struggled with it in other cases where awards for mental anguish were permissible. For example, in *Western Union Telegraph Co.* v. *Bickerstaff,* 100 Ark. 1, 138 S.W. 997, we said:

> It is always difficult to measure in money a sentiment or the suffering of an anguished mind; but in cases of this kind the courts are called upon to do this, and it will not do to say that, because these matters cannot be definitely estimated, any sum, without limit, may be assessed as a measurement of such damage.

> In the case of *W.U. Tel. Co.* v. *Weninski,* 84 Ark. 457 [106 S.W. 486], this court said: "The element of mental anguish allowed by the statute in the assessment of

damages for non-delivery of a telegram is so indeterminate in its nature that it must be left to some extent to the trial jury, but there is a limit to the power and discretion of the jury in this respect, and it becomes our duty to set aside an assessment which is palpably excessive."

In the case of *W.U. Tel. Co.* v. *Blackmer,* 82 Ark. 526 [102 S.W. 366], \*\*\* the court said: "No safe and satisfactory rule can be laid down for the assessment of damages in cases like this, but each particular case must be decided upon its own merits. \*\*\*"  .

Ordinarily the amount of damages growing out of mental anguish is left to the determination of the jury. Yet it is also the duty of the court to see that these damages are sustained by the facts and circumstances adduced in evidence in the case, and, where the amount returned by the jury is excessive, to review its assessment. \*\*\*

Typical of the cases from other jurisdictions wrestling with the problem is *Zorn* v. *Crawford,* 252 S.C. 127, 165 S.E. 2d 640 (1969) where the court said:

The assessment of such intangible elements of damage is most difficult and the court is always reluctant to interfere with the exercise of the jury's discretion in fixing the amount to be awarded. The loss to parents from the untimely death of a devoted child is not to be minimized. However, there must be some limitation on the amount to be awarded in such cases. As stated in *Nelson* v. *Charleston & W.C. Ry. Co.,* 231 S.C. 351, 98 S.E. 2d 798, quoting in part from the Mock case, "the propriety of the exercise by this Court of its power to set aside a verdict on the ground that it is so shockingly excessive as to manifestly show that the jury was actuated by passion, prejudice or other considerations not founded on the evidence 'is inherently difficult where, as in the case at bar, there is no tangible factor of damage, such as earning capacity, and the standard of recovery must be measured only by such imponderables as mental

anguish, grief and loss of companionship.' The valuation to be placed upon these elements is wisely left to the discretion of the jury. But it does not follow that the amount which may be awarded is wholly without any limitation. The determination is not left to the whim or caprice of the jury. There must be some semblance of a basis for justifying the verdict."

Because of the difficulties inherent in the allowance of such damages, we have undertaken to review the positions we have heretofore taken on such awards to determine whether we have articulated any rules or established any standards for appellate review regarding this element of damages, and to apply whatever principles we are able to discern from our previous decisions to the awards in this case.

The first case reaching this court where there was a judgment for this element in a wrongful death case was *Bockman* v. *Butler,* 226 Ark. 159, 288 S.W. 2d 597. Even though the jury verdict for mental anguish was attacked by appellant there on the ground that it was not supported by any evidence of such mental anguish, we settled the question by merely saying that mental anguish was clearly reflected by the evidence, without elaboration. We have done little better since then, in spite of the fact that in *Peugh* v. *Oliger,* 233 Ark. 281, 345 S.W. 2d 610, we attempted to define mental anguish by reference to earlier cases as something more than normal grief occasioned by the loss of a loved one. Too often, the fact that, in *Peugh,* we said that the legislature undoubtedly used the words as they had been previously construed by this court, has been overlooked. From these definitions, to be recoverable mental anguish must be real and with cause and not merely the result of a too sensitive mind or a morbid imagination. It must not consist simply of annoyance or disappointment or a suffering of the mind growing out of some imaginary situation but must be some actual distress of mind flowing from the real ills, sorrows and griefs of life. In arriving at the "more than normal grief" test, we also resorted to a definition of anguish as extreme pain, agony, distress, pain of mind. However satisfactory this test may be, the problem, as is so often the case, lies not in its statement, but in its application. In *J. Paul Smith Co.* v. *Tipton,* supra, 237 Ark. 497, where

minor children were killed, we stated that

> *** As to the *deceased boys,* there has not been and never will be devised a definite and satisfactory rule by which to determine the amount of money required to compensate parents for mental anguish. ***

We have never really come to grips with the problem presented by a motion for directed verdict on the issue or an objection to submitting this element of damage to the jury, except as we treated the matter in *Peugh.* In *Peugh,* we did set about the task of reversing and dismissing judgments for want of evidentiary support and reducing them for excessiveness. It seems clear from that case that the next of kin who does not appear at the trial, does not testify that he suffered mental anguish, and does not attend the funeral of the deceased is not entitled to recover, at least in the absence of some explanation.

Our approach in *Peugh* seems to be consistent with the thinking of Prof. Prosser. In a slightly different context, he suggested that a substantial verdict for mental anguish should be reversed where the evidence of damage consists solely of subjective testimony by the plaintiff, unsupported by any independent proof, and that such evidence attesting to the genuineness of the anguish should consist of convincing objective testimony that a plaintiff's mental anguish was extreme. Recovery should be permitted in this context, he said, when there has been damage of importance and gravity. Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich. Law Rev. 878, 888 (1938-39).

Our cases subsequent to *Peugh* provide only weak and indistinct guidelines to indicate when the evidence is and when it is not sufficient to present a jury question. It seems that a verdict will not be sustained where there are no special ties of affection between a mature survivor and an elderly decedent and there is no proof on the subject except that the survivor had love and affection for the decedent. *Moore* v. *Robertson,* 244 Ark. 837, 427 S.W. 2d 796. We have, as pointed out in *Scoville* v. *Missouri Pac. R. Co.,* 458 F. 2d 639 (8 Cir., 1972), stressed the necessity of showing exceptional circumstances or a par-

ticular relationship between the survivor and the deceased to sustain an award. See *St. Louis Southwestern Ry. Co.* v. *Farrell,* 242 Ark. 757, 416 S.W. 2d 334.

The difficulty in finding practical approaches to measuring grief in an effort not to cure it, but to compensate it, by the clumsy remedy of money damages is not a problem peculiar to the one we are addressing here. It is common to measurement of damages for physical pain and suffering,[3] disfigurement, malicious prosecution, false arrest, breach of promise, alienation of affections, unlawful search and seizure, defamation and other such injuries. See *Knierim* v. *Izzo,* 22 Ill. 2d 73, 174 N.E. 2d 157 (1961). The problem lies in the nature of man's emotions and our inability to accurately measure their strength and their different effects on different individuals. With no better tests than we presently have for measuring grief, we must resort to evidence of such things as length and intensity of the emotion. See Goodrich, Emotional Disturbance as Legal Damage, 20 Mich. Law Rev. 497 (1922).

Resort to testimony from observers alone tends to reward those who make a display of their emotions, or who are emotionally unstable, at the expense of those more stable or stoic by nature; but justifying an award on appellate review is easier when the evidence of grief can be observed by others. Reliance on testimony consisting of subjective statements tends to "overcompensate" those whose histrionic abilities are great or well developed and to "undercompensate" those whose articulation is restrained or inhibited. Simulation of grief may well be easier than simulation of pain, and for a greater number of reasons. The hazard of misrepresentation or obscuration of truth for economic reasons is at least as great as, if not greater than, it is in cases involving physical suffering. Goodrich, Emotional Disturbance as Legal Damage, 20 Mich. Law Rev. 497, 505. Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich. Law Rev. 874, 877 (1938).

---

[3]Pain and suffering of an injured person has been classified as mental anguish. See *Spiller* v. *Thomas M. Lowe, Jr. and Associates,* 466 F. 2d 903 (8 Cir., 1972); *Merrill* v. *Los Angeles Gas & Electric Co.,* supra, 158 Cal. 499.

It seems that it is not required that a survivor testify and subject himself to the observation of the jury in order to recover for mental anguish, but that some evidence of the suffering of more than normal grief, other than a survivor's subjective statements is required. Usually, the trial judge will be in a better position than are we to determine whether there is sufficient evidence to raise a question whether there was more than normal grief.

We have not found any gauge by which we can measure a verdict for excessiveness. We have sustained, reversed or reduced verdicts upon attack for excessiveness without any real indication of the evidence which either supported or failed to support the verdict. See *Tiner v. Tiner,* 238 Ark. 222, 379 S.W. 2d 425; *Strahan v. Webb,* 231 Ark. 426, 330 S.W. 2d 291; *J. Paul Smith Co. v. Tipton,* supra; *Eisele v. Beaudoin,* 240 Ark. 227, 398 S.W. 2d 676; *Ellsworth Brothers Truck Lines v. Mayes,* 246 Ark. 441, 438 S.W. 2d 724; *Missouri Pac. R. Co. v. Ward,* 252 Ark. 74, 477 S.W. 2d 835.

We have said time and again that the amount of money required to compensate for "more than normal grief" lies largely within the province of the jury. See *Curbo v. Harlan,* 253 Ark. 816, 490 S.W. 2d 467; *Pitts v. Greene,* 238 Ark. 438, 382 S.W. 2d 904.

In *Strahan v. Webb,* supra, we asked, "Who can say how much mental anguish is worth?" We felt prone to state that an answer to the inquiry lay in the realm of speculation. But there must be a more satisfactory answer. Perhaps we came the nearest to an answer in *Norman v. Gray,* 238 Ark. 617, 383 S.W. 2d 489, and in *Tiner v. Tiner,* supra, where we quoted with approval a portion from 15 Am. Jur., Damages, § 602, wherein it was said that difficulty in measuring damage of this sort should not preclude recovery and that the amount to be awarded rests in the discretion of the jury, subject to review as in other cases. Apparently, in *Norman,* we recognized that some degree of conjecture by a jury is permissible in wrongful death cases where an element of damage is incapable of definite calculation. We tersely stated that the determination was the province of the jury in *Eisele v. Beaudoin,* supra. Our brethren of the United States Circuit Court of Appeals for the Eighth Circuit, in diversity cases from

Arkansas, have said that the jury is the tribunal best suited to measure the impact upon the survivors. *Vickers* v. *Gifford-Hill & Co., Inc.*, 534 F. 2d 1311 (8 Cir., 1976); *Connell* v. *Steel Haulers, Inc.*, 455 F. 2d 688 (8 Cir., 1972).

Appellate review may present no greater problem than when awards are made for pain and suffering or when conduct is measured by the "reasonably careful person" standard, or any determination is based upon the standard of reasonableness.

An analysis of our decisions discloses that there are certain factors to be considered in evaluating mental anguish, such as: (1) The duration and intensity of the sorrow and grief [*Strahan* v. *Webb*, supra; *J. Paul Smith Co.* v. *Tipton*, supra; *Missouri Pac. R. Co.* v. *Ward*, supra, 252 Ark. 74. See also, *Scoville* v. *Missouri Pac. R. Co.*, 458 F. 2d 639 (8 Cir., 1972)]; (2) The attitude of the decedent toward the survivor [*Strahan* v. *Webb*, supra; *Pitts* v. *Greene*, supra; *Moon Distributors, Inc.* v. *White*, 245 Ark. 627, 434 S.W. 2d 56. See also, *Ellsworth Bros. Truck Lines* v. *Mayes*, supra], and of the survivor toward the decedent [*Rhodes* v. *Bernard*, 248 Ark. 869, 454 S.W. 2d 318, 47 ALR 3d 961]; (3) The duration and intimacy of the relationship and the ties of affection between decedent and survivor [*Peugh* v. *Oliger*, supra; *Mode* v. *Barnett*, 235 Ark. 641, 361 S.W. 2d 525; *St. Louis Southwestern Ry. Co.* v. *Farrell*, supra, 242 Ark. 757; *Moore* v. *Robertson*, 244 Ark. 837, 427 S.W. 2d 796; *Rhodes* v. *Bernard*, supra; *Missouri Pac. R. Co.* v. *McDaniel*, 252 Ark. 586, 483 S.W. 2d 569. See also *Ellsworth Bros. Truck Lines* v. *Mayes*, supra; *Connell* v. *Steel Haulers, Inc.*, supra] (It appears that the relationship must be closer than that of the average family to support an award. Cf. *Strahan* v. *Webb*, supra, and *Mode* v. *Barnett*, supra); (4) The violence and suddenness of the death [*Peugh* v. *Oliger*, supra; *Mode* v. *Barnett*, supra. See, *Vickers* v. *Gifford-Hill & Co., Inc.*, supra. See also, *Scoville* v. *Missouri Pac. R. Co.*, supra; *Connsell* v. *Steel Haulers, Inc.*, supra]; (5) Maturity or immaturity of survivor [*Mode* v. *Barnett*, supra; *Missouri Pac. R. Co.* v. *McDaniel*, supra]

In our cases, certain evidence has been considered significant: (1) Sleeplessness or troubled sleep over an extended period [*Strahan* v. *Webb*, supra; *J. Paul Smith Co.* v. *Tip-*

*ton,* supra; *Missouri Pac. R. Co.* v. *McDaniel,* supra; *Missouri Pac. R. Co.* v. *Ward,* supra]; (2) Frequency of association and communication between an adult decedent and an adult survivor [*Peugh* v. *Oliger,* supra; *St. Louis Southwestern Ry. Co.* v. *Farrell,* supra; *Ellsworth Bros. Truck Lines* v. *Mayes,* supra; *Missouri Pac. R. Co.* v. *McDaniel,* supra]; (3) Obvious extreme or unusual nervous reaction to the death [*Peugh* v. *Oliger,* supra; *Mode* v. *Barnett,* supra; *Norman* v. *Gray,* supra, 238 Ark. 617; *Pitts* v. *Greene,* supra; *Missouri Pac. R. Co.* v. *McDaniel,* supra]; (4) Crying spells over an extended period of time [*Mode* v. *Barnett,* supra; *Rhodes* v. *Bernard,* supra]; (5) Adverse effect on survivor's work or school [*Mode* v. *Barnett,* supra; *Pitts* v. *Greene,* supra; *Rhodes* v. *Bernard,* supra]; (6) Change of personality of the survivor [*Norman* v. *Gray,* supra; *Rhodes* v. *Bernard,* supra. See also, *Connell* v. *Steel Haulers, Inc.,* supra]; (7) Loss of weight by survivor and other physical symptoms [*Norman* v. *Gray,* supra; *Rhodes* v. *Bernard,* supra]; (8) Age and life expectancy of the decedent [*St. Louis Southwestern Ry. Co.* v. *Farrell,* supra; *Missouri Pac. R. Co.* v. *McDaniel,* supra].

Other matters which a jury might consider and we have considered when the amount of a verdict is questioned, are: (1) Failure of survivor to appear and testify [*Peugh* v. *Oliger,* supra; *Mode* v. *Barnett,* supra; *Missouri Pac. R. Co.* v. *McDaniel,* supra. Cf. *Ellsworth Bros. Truck Lines, Inc.* v. *Mayes,* supra]; (2) Visible signs of grief of survivor while testifying [*Pitts* v. *Greene,* supra].

We have indicated that a reversal or reduction of an award for mental anguish would be in order when it: (1) Shocks the conscience of the court [*International Harvester Co.* v. *Land,* 234 Ark. 682, 354 S.W. 2d 13; *Tiner* v. *Tiner,* supra; *Eisele* v. *Beaudoin,* supra, 240 Ark. 227; *Moon Distributors, Inc.* v. *White,* supra, 245 Ark. 627]; (2) Demonstrates passion or prejudice on the part of the jury [*Moon Distributors, Inc.* v. *White,* supra].

Other jurisdictions have concluded that this is the proper standard for review of such a verdict for excessiveness. See, e.g., *Georgia Southern & Florida Ry. Co.* v. *Perry,* supra, 326 F. 2d 921.[4] No other workable standard for review has been

[4]See *Missouri Pacific R. Co.* v. *McDaniel,* supra, 252 Ark. 586, Fogleman, J., concurring.

found. Of course, Prof. Prosser's suggestion, that a substantial verdict based on subjective testimony only should be reversed, is as pertinent to review for excessiveness of a verdict as it is to review for substantial evidence of more than normal grief. Prof. McCormick suggests that the matter must be left largely to the restraint and common sense of the jury and that both the trial court and the appellant court should review only in cases of obviously unreasonable awards. McCormick, Damages (1935) p. 315, § 88. We conclude that there is no satisfactory standard of appellate review other than that which we have previously indicated in such cases as *Land, Tiner, Eisele* and *Moon Distributors.* These are the same tests we apply in reviewing jury awards for pain and suffering.

There was sufficient evidence to present a fact issue on the question of mental anguish, i.e., more than normal grief in the case of each survivor. Brenda Taylor left her mother, Florence Pennington, then 59, a brother and four sisters. The Pennington family was very close-knit. They went fishing and camping together. They joined in cookouts. They had birthday suppers for every member of the family. They, along with the families of each of the Pennington children, all of whom were married, were together two or three times a week and at least every weekend. When they assembled they usually played softball and football. Brenda was described as having "generated the whole family" and as being the "life of the family," and "the joy of everything." She had lived with her mother until she married about four years prior to her death. Brenda was very generous in loaning or giving money to every member of the family who needed it, and being without children of her own, bought things for children of her brother and sisters. She had a life expectancy of 44 years when she was killed. There was testimony that the family did not get together after Brenda's death as often as they had previously. Marcie Ernest, a sister, attributed that to the fact that there was always something missing, because Brenda had been "like the special one."

Florence Pennington had lived in Bearden since her husband's death in 1960 until she took up residence with her youngest daughter, Patsy Pierce, a few months before Brenda's death. She told of the good relationship among her

daughters. She was with her children two or three times a week and talked to Brenda on the telephone two or three times a week and sometimes daily. She said that Brenda's death was mighty bad. Brenda took her to see a doctor and to get medicine and either fixed her hair or took her to a beauty shop. Mrs. Pennington had an expectancy of 16 years when Brenda was killed.

William M. (called "Marion") Pennington, a brother, told of the great love he and this sister had for one another and said he had experienced regret, some of which he still felt, but that these were things which one had to live with and get over, even though it was hard for a while.

Christine Castleberry, a sister who was a nurse, said that she was ten years older than Brenda and had helped raise her. Knowing that she would be unable to attend Brenda's birthday supper, she had entertained Brenda and her husband with a Sunday dinner and had given her a present. She said that she and Brenda were together once or twice a week. Brenda and her husband were very fond of the two Castleberry children and that feeling was reciprocal. She said that to her Brenda's death was like losing a child and she had not gotten over it.

Marcie Ernest, aged 23, Lanell Williams, aged 24, and Brenda Taylor all worked at the same place and took breaks and lunch together. Marcie said that Brenda was the first person to whom she talked every morning after getting to their place of work. Marcie used to ride the bus to Brenda's house and Brenda would take her to eat or to a show. When Marcie played basketball, Brenda came to watch and was happy with her team's victories and sad with their losses.

Lanell Williams said that in the fifteen years following their father's death, Brenda was like a mother. Even though she and Brenda saw each other every day they were working, Brenda would often call her on the telephone, particularly if Brenda sensed there was something wrong. She said that Brenda would not let anyone be sad.

Patsy Pierce, aged 21, was the baby of the family and felt

that Brenda was partial to her. She said that after Brenda left home, she would usually come to the Pennington home every Saturday and would often take Patsy to Fordyce, buy clothes for her and take her to lunch. Patsy said that when she graduated from high school, she was enabled to buy her senior pictures by Brenda's cashing a savings bond and giving her the money. She said, "We won't ever get over Brenda's death really." Patsy's husband testified that she could not sleep after Brenda's death and that Patsy had lost several nights of sleep. Patsy and her husband were the hosts for the birthday supper celebrating Brenda Taylor's birthday and that of a nephew of both Brenda and Patsy.

There was little in the way of objective evidence of actual grief in the testimony, but there was little room for a jury to doubt that this was a happy family whose relationship was unusually close; that Brenda was the catalyst of that relationship; and that the mutual ties of affection and devotion were very strong. The violence and suddenness of the death were significant.

In view of these factors, the jury could have found that each of Brenda's surviving siblings experienced more than normal grief, even though it may not be easy to understand how Marion Pennington was entitled to the same award as Patsy Pierce, for example. Yet the jury had the opportunity to observe each of these persons testifying and we cannot say that the verdict is so disproportionate to the grief suffered by any of them as to indicate passion and prejudice or to shock the conscience of the court.

The extremely liberal award to Florence Pennington presents greater difficulty. She lived with her youngest daughter Patsy. Her recovery for pecuniary loss adequately compensated for the services rendered to her by Brenda and money she received from her. The award of an amount in excess of that for a mental anguish that the mother could only describe as "mighty bad" is liberal indeed. A majority of the court is of the view, not shared by the writer, that this verdict is not indicative of passion and prejudice and does not shock the conscience of the court.

There is one item of the judgment that must be reduced. The verdict allowed $2,000 to the estate. The only evidence to support any recovery by the estate was the testimony that funeral expenses were $972.32 and the cost of a tombstone $469.32. This totals $1,441.64. The judgment is reduced by $558.36.

The judgment is affirmed, as modified.