# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-1041
_____

Frank Hohn

*Plaintiff - Appellant*

v.

BNSF Railway Company

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: December 11, 2012
Filed: February 28, 2013
_____

Before WOLLMAN, BYE, and BENTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

BNSF Railway Co. (BNSF) placed locomotive machinist Frank Hohn on medical leave to have his eyes examined and thereafter did not allow him to return to his position. Hohn, who is visually impaired, filed suit, alleging that BNSF retaliated against him for reporting a safety violation and that BNSF discriminated

against him based on his disability. The district court[1] granted summary judgment in favor of BNSF on the whistleblower claim, and the jury found in favor of BNSF on the discrimination claims. On appeal, Hohn challenges the orders granting summary judgment, excluding evidence related to the safety complaint, and denying his motions for a new trial and to set aside the order awarding costs. We affirm.

## I. Background

BNSF hired Hohn in December 1997 to work as a locomotive machinist at its maintenance facility located in Alliance, Nebraska. A locomotive machinist performs a myriad of locomotive servicing, maintenance, and troubleshooting functions, including inspecting and replacing brake shoes and traction motors, replacing filters, and ensuring that proper lubricating oil levels are maintained. In December 2003, Hohn fractured the bone above his right wrist when he fell on a slick, uneven surface at the Alliance facility. Hohn was placed on light duty while he recovered and was released to work without restriction in late March or early April 2004.

Around that time, Hohn's supervisors noticed that he was displaying signs of vision impairment or were told that he had troubles seeing. Douglas Miller observed Hohn walking slowly and cautiously, looking around at things, and missing handrails when he tried to grab onto them. Cecelia Deichert observed that Hohn did not see her if she approached him from the side. Deichert and Jennifer Crawford expressed concerns regarding Hohn's vision to Jack Wilson, the assistant superintendent at the maintenance facility. Wilson instructed Deichert, Crawford, and Miller to memorialize their concerns, which they did. Deichert's memo, dated April 20, 2004, stated:

---

[1]The Honorable Joseph F. Bataillon, then Chief Judge, United States District Court for the District of Nebraska, ruled on the motion for summary judgment. The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, presided over the trial and ruled on the post-trial motions.

> Several machinists have told me that Mr. Frank Hohn can not [sic] see. They do not wish to work with him because they are afraid of getting hurt. They have even noticed that as he walks he is having trouble seeing where he is going. They fear for his well being.

Crawford's April 25, 2004, memo reported that she had observed Hohn "having problems with his vision during the performance of his duties, such as hooking up walkway chains and adjusting brake shoes," and that Hohn "appeared to struggle with writing up his paperwork[.]" Miller reported that several of Hohn's coworkers had expressed concerns regarding Hohn's vision and safety.

In late April, Hohn reported to a railway safety hotline that he had been forced to perform an unsafe act. Specifically, while inspecting a locomotive on April 17, 2004, Hohn discovered that a cylinder was malfunctioning. He believed that the problem might cause the motor to lose compression and blow out an exhaust valve, so he summoned a supervisor and refused to load test the locomotive. Hohn recommended that the locomotive be moved to the shop for repairs. The supervisor who had responded to Hohn's call regarding the malfunction called the general foreman to evaluate the cylinder. The general foreman disagreed with Hohn's assessment and determined that the cylinder was not malfunctioning. He instructed Hohn to run the locomotive under full load. Hohn did so, notwithstanding his concerns, because he believed that he might lose his job if he refused to test the locomotive as ordered. On April 19 or 20, Hohn reported the incident to a railway safety hotline. On April 21, Calvin Hobbs, the shop superintendent, received notification of Hohn's safety complaint. In response, Hobbs investigated the incident and found that two supervisors and a foreman had assessed the locomotive and disagreed with Hohn's conclusion. Hobbs explained that the load test was completed without incident and that the locomotive had not subsequently experienced any mechanical problems. In an April 27, 2004, e-mail, Hobbs wrote, "We feel this employee is using safety as an answer for a productivity issue that is in the process of being addressed and corrected with him."

By letter dated April 26, 2004, Hobbs informed Hohn that he would be placed on paid medical leave so that he could have his eyes examined. The letter instructed Hohn to contact his optometrist and Angela Bailey, the BNSF medical and environmental health regional director. Hohn received the letter on April 29, 2004, and remained on paid medical leave until early June 2004.

Optometrist Robert Dietrich evaluated Hohn in May 2004 and diagnosed him as having advanced stage retinitis pigmentosa, a degenerative eye disease that causes tunnel vision and night blindness. Retinitis pigmentosa, for which there is no known cure, often causes blindness. Consistent with the diagnosis, Dr. Dietrich found that Hohn suffered from night blindness and that his field of vision was limited to about 15 degrees in each eye. Dr. Dietrich testified that he measured Hohn's visual field using uniformly bright light, noting that "in dimly lit situations there's going to be a lot of challenge to his vision[.]" Dr. Dietrich believed that Hohn should surrender his driver's license and consider "full [and] permanent disability vs. actively working."

Dr. Dietrich recommended the following work restrictions: no walking on uneven surfaces; no more than occasional bending or stooping; no operating vehicles or machinery; no climbing ladders or scaffolds; no working on unprotected heights; no more than occasional lifting of greater than 20 pounds; and no job that requires more than 15 degrees visual field. When asked why he restricted Hohn from working in places requiring more than 15 degrees visual field, Dr. Dietrich replied,

> Any task that would require greater than that could potentially put him in a position where he might stumble, fall, [or] give incorrect directives to others . . . . So basically just to confine him to a work station where it involves not much movement, not much change in light -- lighting from darker areas to more bright areas, and so forth, that would hinder his judgments.

-4-

Two other doctors evaluated Hohn and in most part agreed with Dr. Dietrich's restrictions.

Sharon Clark, BNSF's medical field officer and doctor of osteopathic medicine, reviewed the recommended restrictions. She testified that the area where Hohn worked was a "360-degree environment[,]" where operations occur "above, below, behind, in front of and to the left and right of one's activities." Given Hohn's reduced visual field, Dr. Clark believed that the restrictions were well advised, and she approved them in July 2004. Hobbs determined that the work restrictions would prevent Hohn from performing the essential functions of the machinist position.

After the restrictions were approved, Bailey began to work with Hohn to determine whether he could return to work as a machinist or in another position with the railroad. Although Bailey supported conducting an on-site evaluation to determine whether Hohn could perform the job of a machinist, Dr. Clark disagreed. Dr. Clark concluded that Hohn could not perform such an evaluation without running afoul of the work restrictions. Hobbs testified that he would have agreed to an on-site evaluation if the medical and legal departments had approved it. Dr. Clark and Bailey remained in contact with Hohn throughout 2005. Hohn, however, was not allowed to return to work after being withheld from service on April 29, 2004.

Hohn filed a charge of discrimination and retaliation with the Nebraska Equal Opportunity Commission (NEOC or commission). Hohn alleged that BNSF withheld him from service for reporting the April 17, 2004, incident to the railway-safety hotline and that BNSF discriminated against him on the basis of his disability. The commission found that the evidence was insufficient to support the charge and thus found no reasonable cause. Hohn received notification of the commission's finding on August 4, 2005. The Equal Employment Opportunity Commission (EEOC) issued its right-to-sue letter on September 21, 2005.

Hohn filed suit in federal district court on December 20, 2005. He alleged that BNSF violated the Americans with Disabilities Act (ADA), see 42 U.S.C. § 12101 *et seq.*, and the Nebraska Fair Employment Practices Act (NFEPA), see Neb. Rev. Stat. § 48-1101 *et seq.*, when it discriminated against him on the basis of his disability and failed to reasonably accommodate his disability. He also claimed that BNSF violated Nebraska law when it retaliated against him for reporting a safety violation. BNSF later moved for summary judgment, arguing, in part, that Hohn's retaliation claim should be dismissed as untimely. The district court granted summary judgment in favor of BNSF on the retaliation claim, albeit on different grounds, holding that Hohn had not shown "any adverse employment action connected to his opposition to an unlawful act by [BNSF]." D. Ct. Order of Sept. 26, 2007, at 13-14.

Hohn's disparate treatment and reasonable accommodation claims proceeded to trial. Hohn sought to introduce evidence of the events underlying his safety-hotline report, the report itself, and BNSF's response. The district court sustained BNSF's objection to the evidence, finding it irrelevant.

> I find that the hotline issue is not an issue in this case. I don't see how evidence of the hotline can be relevant to anything because -- accepting [the district court's summary judgment ruling,] the retaliation claim is out. [The district court] dismissed the retaliation claim. And [it] has further found that the hotline is not a protected activity under the ADA. All of that being true, and this being solely now an ADA case, anything relating to the hotline and what may have happened and what actions may have been taken in response to it are irrelevant to the issues in this case.

The district court instructed the jury that, to return a verdict for Hohn on his disparate treatment claim, it must find that Hohn could perform the essential functions of the locomotive machinist position at the time BNSF refused to allow him to return to work. On the reasonable accommodation claim, the district court instructed the jury to determine whether Hohn could have performed the essential functions if

BNSF had provided an "on the job, work site, evaluation and provided the accommodations resulting from such evaluation." The jury returned a verdict in favor of BNSF on both claims and did not reach BNSF's affirmative defense that Hohn posed a direct threat to the health or safety of himself or others in the workplace. The clerk of court taxed costs against Hohn. The district court denied Hohn's motion for a new trial and refused to set aside the costs.

## II. Discussion

### A. Summary Judgment

We review *de novo* the district court's grant of summary judgment and may affirm the judgment on any basis supported by the record. St. Martin v. City of St. Paul, 680 F.3d 1027, 1032 (8th Cir. 2012). Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

Nebraska law prohibits employers from retaliating against employees for "oppos[ing] any practice or refus[ing] to carry out any action unlawful under federal law or the laws of this state." Neb. Rev. Stat. § 48-1114(3). The NEOC considers claims alleging that an employer discriminated against a whistleblower. Following the NEOC's administrative process, a complainant may bring a claim to the district court. "The deadline for filing an action directly in the district court is ninety days after the complainant receives notice of the last action the commission will take on the complaint or charge." Id. § 48-1120.01. The statute explains that "[t]he last action on the complaint or charge includes the issuance of the final order after hearing, the determination of reasonable cause or no reasonable cause, and any other administrative action which ends the commission's involvement with the complaint or charge." Id.

-7-

Hohn's whistleblower claim should have been dismissed as untimely. By letter dated August 1, 2005, the NEOC notified Hohn that it had officially closed his charge because the evidence was insufficient to support the allegations of discrimination. The letter stated, "This finding of no reasonable cause is the final determination of the Nebraska Equal Opportunity Commission and completes the Commission's handling of the charge." It is undisputed that Hohn received the letter from the commission on August 4, 2005, and did not file this lawsuit until December 20, 2005. Because he failed to file his lawsuit within ninety days from the notice of the commission's last action on his complaint—that is, the determination of no reasonable cause—the district court should have dismissed the claim.

Hohn argues that the claim is timely because the statute of limitations should run from the date he received the right-to-sue letter from the EEOC. He argues that the EEOC and the NEOC work together under a work sharing agreement and thus the EEOC's letter triggered the statute of limitations. Such an interpretation contradicts the plain language of the Nebraska statute. As set forth above, the statute provides, "The last action on the complaint or charge includes . . . the determination of reasonable cause or no reasonable cause . . . ."[2] Neb. Rev. Stat. § 48-1120.01.

---

[2]To the extent Hohn argues that the Erie doctrine requires application of a federal rule or procedure, he has not identified one that competes with the state statute of limitations. Because his whistleblower claim arises under state law and there is no federal procedure that differs from the state procedure, we follow the state statute of limitations. See Appletree Square I, Ltd. v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir. 1994) ("There is simply no reason why, in the absence of a controlling federal rule, an action based on state law which concededly would be barred in the state courts by the state statute of limitations should proceed through litigation to judgment in federal court solely because of the fortuity that there is diversity of citizenship between the litigants.") (quoting Walker v. Armco Steel Corp., 446 U.S. 740, 753 (1980)).

Hohn contends that if we find his claim untimely, the statute of limitations should be equitably tolled. He argues that the Nebraska legislature would intend for the deadline to be tolled, with the receipt of the EEOC right-to-sue letter triggering the limitations period. Even assuming equitable tolling applies, the plain language of the statute provides that the NEOC's last action triggers the running of the statute of limitations, not an EEOC action. Had the legislature intended the limitations period to begin running upon the receipt of the EEOC right-to-sue letter, it could have so provided in the statute. See Rosberg v. Johnson, 815 N.W.2d 867, 870 (Neb. 2012) (Legislative purpose and intent is "ascertained from the entire language of a statute considered in its plain, ordinary, and popular sense."). Hohn's whistleblower claim was thus untimely, and summary judgment should have been granted on that ground.

## B. Evidentiary Challenge

Hohn argues that the district court erred when it excluded as irrelevant the evidence of his safety complaint. Evidence is relevant if it tends to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. "[W]e accord the district court 'wide discretion in admitting and excluding evidence, and its decision will not be disturbed unless there is a clear and prejudicial abuse of discretion.'" McPheeters v. Black & Veatch Corp., 427 F.3d 1095, 1101 (8th Cir. 2005) (quoting Bennett v. Hidden Valley Golf and Ski, Inc., 318 F.3d 868, 878 (8th Cir. 2003) (internal quotations omitted)). We will not reverse a judgment on the basis of an erroneous evidentiary ruling absent a showing that the ruling had a substantial influence on the jury's verdict. Id.

Hohn argues that the safety-complaint evidence is relevant because it would have helped prove that he could perform the essential functions of a locomotive machinist. He contends that the circumstances surrounding the complaint constituted evidence that BNSF retaliated against him when it required him to submit to a

medical exam. Specifically, the timing of Hobbs's decision to withhold Hohn from service coincided with Hobbs receiving notification of Hohn's complaint and responding to it. According to Hohn, the excluded evidence thus would rebut the evidence that he was withheld from service because his supervisors were concerned about his vision. Instead, he argues that the evidence supports a finding that "BNSF believed he could perform the essential functions of his job without any problems immediately before he was withheld from service." Appellant's Br. 48.

We disagree. The disputed evidence may have helped explain Hohn's theory that he was withheld from service for reporting a safety violation, but BNSF's motivation for placing him on medical leave is not necessarily a fact of consequence. At best, the safety-complaint evidence would have supported an inference of retaliation for withholding Hohn from service. Hohn's retaliation claim, however, had been dismissed, and only the disability discrimination claims remained. We thus find no abuse of discretion in the district court's decision to exclude the evidence.

Even assuming that the reason Hohn was withheld from service was relevant, Hohn has not shown that the disputed evidence might have influenced the jury's verdict. The disability claims required the jury to decide whether Hohn "could have performed the essential functions of the locomotive machinist position at the time [BNSF] refused to allow him to return to work." To return to work, Hohn was required to obtain a medical release, which he was unable to do. Dr. Dietrich evaluated Hohn and recommended work restrictions that, if followed, would not have allowed Hohn to perform the work of a locomotive machinist. Hobbs, who was aware of Hohn's complaint and was involved in the return-to-work process, did not recommend or adopt the restrictions, nor did he deny the on-site evaluation. Hobbs determined only that Hohn's restrictions would prevent him from performing his job duties and that the restrictions could not be accommodated. Hohn presented no evidence to suggest that Hobbs harbored a retaliatory motivation in making those determinations, which were made months after Hohn reported his safety complaint.

-10-

Moreover, Hohn's supervisors had concerns about his vision in the five months before he made the safety complaint.

## C. Motion for a New Trial

Hohn challenges the district court's denial of his motion for a new trial, arguing that the verdict was against the weight of the evidence. We review the denial of a motion for a new trial for abuse of discretion and give "great deference to the district court's ruling." Jones v. Nat'l Am. Univ., 608 F.3d 1039, 1049 (8th Cir. 2010) (quoting Kight v. Auto Zone, Inc., 494 F.3d 727, 735 (8th Cir. 2007)).

To prove his disability discrimination claim, Hohn was required to show that he was qualified to perform the essential functions of his position, with or without reasonable accommodation. 42 U.S.C. § 12111(8); Neb. Rev. Stat. § 48-1102(10)(a). He contends that he met his burden and that BNSF offered no evidence to the contrary. According to Hohn, BNSF's evidence related only to its concerns that Hohn could not perform his duties safely and thus supported only its affirmative defense that Hohn posed a "direct threat" to the health or safety of himself or others in the workplace. See 42 U.S.C. § 12111(3) (defining "direct threat"). Hohn argues that the jury must have conflated the essential functions inquiry with the direct threat inquiry when it found that Hohn was unable to perform the essential functions of the machinist position, with or without reasonable accommodation.

Sufficient evidence supported the jury's finding that Hohn could not perform the essential functions of the locomotive machinist position with or without reasonable accommodation. As set forth above, a locomotive machinist is required to service and maintain locomotives. The position's essential functions include the "[s]afe and frequent use of machinery[,]" "frequent bending, stooping, kneeling, and climbing ladders, and frequent walking on uneven/angled surfaces." The jury considered medical evidence that Hohn's visual field was restricted to about 15

-11-

degrees in each eye and that he had difficulty seeing in dim light. It also heard Dr. Clark's testimony that Hohn's work area was a "360-degree environment[,]" where machinists worked "within, around, over and under locomotives." Video and photographic evidence of the Alliance facility corroborated Dr. Clark's description and revealed a dynamic environment, with variable lighting, uneven surfaces, scaffolding, ladders, ramps, stairs, overhead objects, and large machinery and locomotives. Indeed, while narrating the video of the work site, Hohn described how as part of their duties machinists are required to enter the "drop table"—an open area over which locomotives, some weighing up to 415,000 pounds, are parked—and then reach up and unhook and lower the traction motors that power the axles.

The jury considered the fact that Hohn had fallen on a slick, uneven surface at work a few months before having his vision checked. It also heard the supervisors' testimony that Hohn's peripheral vision was limited and that Hohn looked at the ground, walked cautiously, and reached for a hand rail that was not where he had placed his hand. In light of this evidence, a reasonable jury could find that Hohn's vision impairments precluded him not only from performing the essential functions safely, but from performing them at all.

Moreover, the restrictions that Dr. Dietrich placed on Hohn disallowed him from performing the essential functions of a locomotive machinist. Hohn chose to see Dr. Dietrich, and although Hohn disputed the restrictions and testified that he was performing tasks that ran afoul of them, Hohn did not offer medical evidence to contradict the restrictions. Hohn's own medical expert expressed concern about Hohn's ability to perform any activities that required movement, including operating a crane, "being in a motor vehicle, motorized cart, [or] doing the train." The jury's verdict thus was not against the weight of the evidence, for "[t]he ADA 'does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden.'" Otto v. City of Victoria, 685 F.3d 755, 758

-12-

(8th Cir. 2012) (quoting <u>Alexander v. Northland Inn</u>, 321 F.3d 723, 727 (8th Cir. 2003)).

## D.  Costs

We conclude that the district court did not abuse its discretion in denying Hohn's motion to set aside the order awarding costs.  <u>See</u> <u>Blakley v. Schlumberger Tech. Corp.</u>, 648 F.3d 921, 930 (8th Cir. 2011) (standard of review).

## III.  Conclusion

The judgment is affirmed.

_____